FILED
2020 Nov-16 AM 10:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| MELISSA ANN SIMS, as Adminstratrix of the Estate of Billy Ray Sims, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF HAMILTON, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)     6:18-cv-1967-LSC<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF OPINION**

## I.   INTRODUCTION

Before the Court is a motion for summary judgment filed by Defendants Jordan Carter ("Carter"), Trey Webb ("Webb"), and the City of Hamilton ("Hamilton") (Doc. 63.); a motion for summary judgment by Marion County (Doc. 65); and a motion for summary judgment by Terry Rich and Jared Tidwell (Doc. 67). Melissa Ann Sims ("Plaintiff") brought this case as adminstratrix of the estate of Billy Ray Sims ("Sims"), deceased, alleging federal constitutional violations under 42 U.S.C. § 1983 and state law claims of negligence. For the following reasons, Defendants' motions for summary judgment are due to be granted in full.s

## II.  FACTS

At approximately 1:30 a.m. on December 13, 2017, police learned of a potential hostage situation at 640 Reese Road, Hamilton, Alabama. (Doc. 64 at 2.) Emergency services dispatched Officers Webb and Carter, Deputy Jared Tidwell ("Tidwell"), and Deputy Terry Rich ("Rich") to this address. (Doc. 41 at 3.) Webb and Carter were employed by the City of Hamilton Police Department, while Deputies Tidwell and Rich were employed by the Marion County Sheriff's Department. (Id.)

Carter was the first to arrive on the scene. At a nearby intersection, he waited for backup to arrive before responding. (Carter Dep. 14:8-14:14.) Webb and Rich arrived, whereupon Rich confirmed 640 Reese Road as the correct address. (Rich Dep. 19:9-19:13.) After confirming the address, the three proceeded to the mobile home of Sims. (*Id.*) However, the three believed the mobile home to be the residence of Trevor Ely, who was known to law enforcement and believed to have been involved in a private incident with shots fired earlier in the month of December 2017. (Doc. 64 at 2-3; Rich Dep. 21:6-22:24; Webb Dep. 26:23-29:17.)

The officers knocked on the door without identifying themselves as law enforcement and received no response. (Doc. 69, ex. F at 00:40-01:45) They then walked around the property and used their flashlights to try to identify if anybody was home. (Ritch Depo., p. 19; Webb Depo., p. 23; Carter Depo., p. 14) After a short

period of time, as the three officers were moving away from the home, Sims turned on the porch light and opened the door with a firearm at his side. (Doc. 64 at 4; Rich Dep. 19:24-20:2.)

In the seven seconds that followed, Carter, Webb, and Rich shouted "put the gun down" roughly five to seven times, as well as "Sheriffs" and "PD" once or twice. (Defendant's Ex. 7 at 13; Carter1.mp4 03:05-03:20; Webb1.mp4 03:50-04:00.) Sims did not drop the weapon.[1] (Carter Depo., p. 15.) However, the plaintiff alleges that Sims would have been unable to raise it to aim at the police, as the four officers claim.[2] (Doc. 74 at 15; Sims Dep. 52:15-58:16.) When Sims did not comply, Webb opened fire. (Defendant's Ex. 7; Carter1.mp4.) Sims was struck in his superior left abdomen, left leg, right leg, and scrotum, but he remained alive and continued to move. (Doc. 41 at 4–5; Doc. 64 at 8; Rich Dep. 43:10-43:14.)

---

[1] Insofar as Plaintiff disputes this fact, she has provided no supporting evidence. Plaintiff's only evidence is the inadmissible character evidence proffered by Sims's daughter that Sims "wouldn't have hurt a fly." Indeed, all evidence that could be admissible at trial—the testimony of all three officers at the scene, the corresponding audio from the body cams, and the position of the gun after Sims's death—uniformly point to Sims's continued possession of the weapon. Although the Court must make all reasonable inferences in favor of the Plaintiff, the court cannot manufacture evidence where there is none. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987)

[2] Plaintiff supports this claim using permissible lay opinion testimony from Sims's daughter, who claims that Sims was unable to raise his arms. Unlike the bare allegations that Sims dropped his weapon, this testimony is sufficient to create a genuine issue of material fact. Accordingly, the Court's opinion assumes Sims had a gun but never pointed it at the officers.

The three officers, joined by Tidwell after the shots had been fired, remained behind their vehicles and away from the porch where Sims was located. (Doc. 69 ex. F at 05:15-30:31.) Carter called 911 and requested an ambulance immediately after the shots were fired. (Webb Dep. 57:18-58:3.) Webb also offered to provide aid if Sims dropped his weapon. (Doc. 69, ex. F at 4:50.) However, the officers did not render medical aid to Sims because he maintained control of the firearm.[3] (Carter Dep. 32:5–32:24; Rich Dep. 43–:6–43:18; Tidwell Dep. 12:6–12:9; Webb Dep. 55:23–56:24.) After additional law enforcement officers arrived, the officers approached Sims in an effort to clear the residence, whereupon they confirmed that Sims had passed away. (Webb Dep. 57:1-57:12.)

## III.   STANDARD

A motion for summary judgement is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v.*

---

[3] Although Plaintiff disputes that Sims maintained control of the weapon, she has provided no evidence for this assertion. Therefore, Defendants' affidavits remain uncontroverted and must be taken as fact. *See Rollins*, 833 F.2d at 1529 (11th Cir. 1987).

*Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The Court must "view the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). "[T]he moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013).

## IV. DISCUSSION

Plaintiff concedes that the Court should dismiss all but three claims: the § 1983 claims against Webb in his individual capacity, the state law claims against Webb, and the state law claims against the City of Hamilton. The Court will address these three remaining claims in turn.

### A. § 1983 claim against Webb

To establish a claim under § 1983 against an individual, a plaintiff must show that a person acting under color of state law deprived him of a federal right. *Myers v.*

*Bowman*, 713 F.3d 1319, 1329 (11th Cir. 2013). Plaintiff alleges three constitutional deprivations: (1) an unreasonable search in violation of the Fourth Amendment, (2) failure to provide medical care in violation of the Fourteenth Amendment, and (3) excessive force in violation of the Fourth Amendment.

### i. Unreasonable search and seizure

The Fourth Amendment protects citizens against "unreasonable searches and seizures." U.S. Const. amend. IV.  This protection extends to the curtilage surrounding a home. *United States v. Dunn*, 480 U.S. 294, 301 (1987). However, an officer may enter the curtilage "to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006). Consistent with this "knock and talk" exception, an officer may move away from the front door in order to contact the occupants of a residence. *See Id.* (citing *United States v. Hammett*, 236 F.3d 1054, 1060 (9th Cir. 2001) ("[A police] officer may, in good faith, move away from the front door when seeking to contact the occupants of a residence."), *abrogated on other grounds by United States v. Jardines* 569 U.S. 1 (2013); *United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001) (recognizing "that law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence"); *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990) (officer may move away

from the front door as part of a legitimate attempt to interview a person); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977) (officer's movement to rear of house after receiving no answer at front door was lawful).

But even a typically unreasonable search can be reasonable if exigent circumstances justify the search. *Kentucky v. King*, 563 U.S. 452, 460 (2011). One such exigency is a "risk of harm to the public"—sometimes called the emergency-aid exception. *United States v. Cooks*, 920 F.3d 735, 742 (2019) (citing *King*, 563 U.S. at 460). If officers have a reasonable belief that a person is in danger, they may conduct a search "strictly circumscribed by the nature of the exigency . . . and limited to the areas where a person reasonably could be found." *Id.* (citing *Montanez v. Carvajal*, 889 F.3d 1202, 1209 n.4 (11th Cir. 2018) (internal quotations omitted).

Plaintiff has not responded to Defendant's motion for summary judgment on this claim. However, a review of the applicable facts also demonstrates that Defendant is entitled to summary judgment. Here, officers entered the curtilage of Sims's mobile home to knock on his door. Although the officers did not identify themselves when they knocked, they were not required to. A knock does not constitute a search, and the knock-and-announce rule applies to "entry into a home." *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995). Because the officers, here, merely knocked on the door without entering, were not required to announce their

status as officers. But even if the knock-and-announce rule did apply, police do not need to announce their presence if they "have a reasonable suspicion" that "circumstances present a threat of physical violence." *Hudson v. Michigan*, 547 U.S. 586. 589-90 (2006). "This showing is not high." *Id.* Because the potential hostage situation provided a reasonable suspicion of physical violence, the officers did not need to announce their presence.

The officers' walk to the rear of the home was also constitutional. Indeed, they did not meander to explore the property. Instead, they simply shined flashlights up at the house to determine if the resident was available to speak. Because the officers left the front porch to contact the resident, they did not conduct a search within the meaning of the Fourth Amendment. However, even if this movement to the rear of the home did constitute a search, it was a search justified by exigent circumstances. The officers had a reasonable belief that a hostage was in danger. In order to determine the extent of this exigency, they briefly surveyed the outside of the home. Because this search was "strictly circumscribed" to a brief walk around the immediate perimeter of the home, their search was reasonable due to the exigency of a potential hostage situation.

### ii. Failure to provide medical care

The Due Process Clause of the Fourteenth Amendment requires the provision of medical care to persons injured while being apprehended by police. *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244 (1983). To prevail under this theory of liability, a plaintiff must show that the officer was "deliberately indifferent to [a] serious medical need." *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015). Multiple gunshot wounds qualify as a serious medical need because they are "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). Therefore, the only question is whether the officers were deliberately indifferent to this need. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009).

"[D]eliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). When an officer delays providing medical care, "the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *Valderrama,* 780 F.3d at 1116 (quoting *McElligott*, 182 F.3d at 1255). "[T]he right reason can make a delay of any duration tolerable." *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

After shooting Sims multiple times in the abdomen, legs, and scrotum, Webb must have known of a risk of serious harm. Instead of disregarding this risk, officers immediately requested an ambulance and even offered to aid Sims personally if he relinquished his weapon. And to the extent that Webb did disregard a risk, his actions were not grossly negligent.  Webb delayed because he continued to feel threatened by Sims's continued control of the weapon. Because Plaintiff has not provided any evidence of an ulterior motive, Webb's actions were not deliberately indifferent as a matter of law. Any delay by Webb was not due to deliberate indifference, but due to the threat posed by Sims.

However, even if there was a constitutional violation, Webb is entitled to qualified immunity. Qualified immunity attaches to the discretionary functions of police officers. *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991). Discretionary acts are those that fall "within the employee's job responsibilities." *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). In applying this test, courts look to the "general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Webb's use of deadly force was incident to his investigation

of a potential hostage situation. Therefore, he was engaged in a discretionary function and is entitled to qualified immunity.

Under qualified immunity, Webb is only liable under § 1983 if his actions violated "clearly established" law. *Keating v. Miami*, 598 F.3d 753, 762 (11th Cir. 2010). This standard "[does] not require a case directly on point, but an existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). Although there is binding precedent demonstrating that an officer must not be deliberately indifferent to a suspect's wounds, the borders of this duty are poorly drawn. The closest comparator involves a case where officers shot a suspect, delayed calling an ambulance so they could fabricate a story justifying the use of force, described the gunshot wounds as mere "lacerations" when they did call the ambulance, and failed to provide medical care to the unarmed victim before the ambulance arrived. *Valderrama v. Rousseau*, 780 F.3d 1108, 1111 (11th Cir. 2015). Here, however, the officers immediately called an ambulance and repeatedly asked Sims to relinquish his weapon so they could provide aid. Because of these factual differences, case law has not put this constitutional question beyond debate. No binding authority would have put Webb on notice of a constitutional violation; therefore, he is entitled to qualified immunity.

    iii.    **Excessive force**

The Fourth Amendment's prohibition against unreasonable searches and seizures includes the right to be protected from the use of excessive force. *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). To determine whether a police officer's force was excessive, courts ask "whether a reasonable officer would believe that this level of force [was] necessary in the situation at hand." *Id.* (citation omitted). The "use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

To determine the level of force a reasonable officer would believe necessary under the circumstances, the Court considers a variety of factors, including "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Alston v. Swarbrick*, 954 F.3d 1312, 1320 (11th Cir. 2020) (internal quotations omitted). "When an officer is threatened with deadly force, he may respond with deadly force to protect himself." *Hunter v. Leeds*, 941 F.3d 1265, 1279 (11th Cir. 2019) (citing *Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010).

Here, Officer Webb's use of force was reasonable. Although Sims committed no crime, officers at the time had a reasonable suspicion that he was holding someone

hostage. Thus, the "crime in issue" was severe—implicating not only the officers' safety, but also the safety of a possible hostage. Moreover, the suspect posed an immediate threat to the safety of the officers. Even if Sims did not raise his weapon, he emerged from the house with the weapon in hand. In the context of a potential hostage situation, this conduct presented an immediate threat. Finally, although Sims did not run, he did refuse to comply with the officers' orders. Indeed, even after the officers announced themselves as "PD" and "Sheriffs," Sims refused to drop his weapon as requested. Under these circumstances, a reasonable officer could have used deadly force.

But even if there was a constitutional deprivation, Webb would be entitled to qualified immunity. The only binding precedent that plaintiffs cite in favor of liability is *Graham v. Conner*, which set up the multi-factor balancing test discussed above. However, as discussed above, a reasonable officer could have believed Webb's actions were constitutional under that framework.

A further review of applicable Eleventh Circuit precedent also reveals no binding law that would have provided notice of a constitutional violation. Possession of a weapon, alone, does not justify the use of deadly force. *See Perez v. Suszczynski* 809 F.3d 1213, 1220 (11th Cir. 2016) (finding a potential constitutional violation when an officer shot a restrained, prone suspect even though he had a gun beside

him). However, "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon" to use deadly force of their own. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010). In *Jean-Baptiste*, an officer shot an armed robbery suspect. After a brief pursuit, the officer followed the suspect into an alleyway and found the suspect facing him—gun in hand. *Id.* Although the suspect never raised his gun at the officer, the court upheld the officer's use of deadly force because the suspect "posed a threat of serious physical injury" to the officer. *Id.*

These cases create a spectrum of permissible conduct that includes Webb's use of deadly force. Unlike the suspect in *Perez*, Sims was not detained and refused to comply with the officers' orders to drop his weapon. Indeed, these refusals occurred even after officers identified themselves immediately before the shooting. Thus, the situation here is much more like *Jean-Baptiste*. Like the suspect in *Jean-Baptiste*, Sims was suspected of a violent crime. Moreover, neither were in custody and both were holding a weapon. Although the suspect in *Jean-Baptiste* was running from the police, this difference alone does not overcome the factual similarities between the two uses of force. *Perez* and *Graham* are too factually dissimilar to give notice to Webb that his use of force against an armed suspect was unconstitutional.

In fact, the precedent set by this circuit in *Jean-Baptiste* likely would have led a reasonable officer to believe that his use of deadly force was sanctioned.

Because there are no underlying constitutional violations, and because Webb is entitled to qualified immunity, Plaintiff's § 1983 claims are due to fail.

### B. State law claim against Webb

An Alabama peace officer is entitled to immunity "from tort liability that may arise from performing a discretionary function within the . . . scope of his or her law enforcement duties." Ala. Code § 6-5-338. But "[p]eace officers are not entitled to absolute immunity under § 6-5-338(a); rather, immunity from tort liability under § 6-5-338(a) is withheld if an officer acts with willful or malicious intent or in bad faith." *Ex parte City of Tuskegee*, 932 So. 2d 895, 906-07 (Ala. 2005) (citations and quotation marks omitted). Under Alabama law, the officer "initially bears the burden of demonstrating that he was acting in a function that would entitle him to immunity." *Brown v. City of Huntsville*, 608 F.3d 724, 741 (11th Cir. 2010) (citing *Ex parte Estate of Reynolds,* 946 So. 2d 450, 452 (Ala. 2006)). "If [the officer] makes such showing, burden then shifts to plaintiff to show that [the officer] acted willfully [or] maliciously . . . ." *Ex parte Estate of Reynolds*, 946 So. 2d at 452.

Here, Webb was responding to a wellness check, investigating a potential hostage situation, and eventually attempting to arrest Sims. Thus, he was performing discretionary functions within the scope of his law enforcement duties. *See Ex parte Brown*, 182 So. 3d 495, 503 (Ala. 2015) (finding an officer's attempted arrest of a suspect is a discretionary function within the scope of a police officer's duty). Because Webb acted within his discretionary authority, Plaintiff has the burden of demonstrating willfulness or bad faith.

Plaintiff does not meet this burden—even when viewing material facts in her favor. Plaintiff produces only one piece of evidence to demonstrate willfulness: the choice of the other officers not to discharge their weapons. This fact, alone, does not constitute substantial evidence. Indeed, the other officers' choice not to discharge their weapons is just as demonstrative of negligence as intent. No reasonable jury could find that Webb shot Sims "willfully" or "in bad faith" from the evidence proffered by Plaintiff. If bald allegations of "willfulness" were sufficient to defeat summary judgment, Alabama's peace officer immunity would be a nullity. Because Plaintiff has not produced substantial evidence that demonstrates willfulness or intent, her state claim of negligence against Webb is due to fail.[4]

---

[4] The Court does not interpret Plaintiff's response brief as attempting to allege intentional torts, because she has not pled these claims in her complaint   Instead, the Court sees the mention of "intentional killing" as a reference to the "intent" required to nullify state immunity. However,

### C. State law claim against City of Hamilton

Finally, Plaintiff seeks to hold the City of Hamilton liable for negligence. Plaintiff seemingly concedes that the city was not the entity that dispatched the officers and, thus, cannot be held liable for negligence stemming from their dispatch. Instead, in her reply brief to Defendant's motion for summary judgment, Plaintiff relies on a theory of respondeat superior under Ala. Code 11-47-190. "Should a jury find that Webb . . . was negligent, then the judgment would [be] against the City of Hamilton." (Pl's. Br. In Opp'n to Summ. J., Doc. 74 at 28.) However, this vicarious liability relies on an officer's underlying negligence. If the officer is entitled to state-agent immunity, "the city by which he is employed is also immune." *Ex parte Dixon*, 55 So. 3d 1171, 1179 (Ala. 2010). Because Webb is immune under §6-5-338, the City of Hamilton is immune as well. Accordingly, the city is due to be granted summary judgment on the negligence claims against it.

### V. CONCLUSION

This case is not about the Sims's perspective or the court's perspective; it is about the perspective of the reasonable officer on the scene at the time. Therefore, it does not matter whether Sims was reasonable—only whether the officers were.

---

insofar as Plaintiff has tried to allege an intentional tort here, her failure to plead this allegation in her complaint makes it fail here.

Under this standard, the Court finds no underlying constitutional violations. Moreover, the Court finds that qualified immunity and peace officer immunity immunize Webb on Plaintiff's federal and state law claims, respectively. Without underlying liability, the vicarious liability claims against the City of Hamilton also fail. Because Plaintiff has expressly conceded her remaining claims against all parties, Defendants' motions for summary judgment (Docs. 63, 65, and 67) are due to be granted in full.

**DONE** and **ORDERED** on November 16, 2020.

_____
L. Scott Coogler
United States District Judge

203171